(157 App. Div. 351.)

### In re McGUIRE et al.

(Supreme Court, Appellate Division, First Department. June 13, 1913.)

1. MUNICIPAL CORPORATIONS (§ 218*)—CIVIL SERVICE—DISCHARGE—CONDUCT DETRIMENTAL TO SERVICE—PRIOR RULES OR ORDERS.

That a city's civil service commission had made no rule or order forbidding the clerk in charge of its computing room from examining the rating sheets in the hands of monitors to take memoranda thereof with respect to the names and ratings of candidates, who had taken civil service examinations, and leaving the room and premises with such memoranda in his pocket, did not preclude the commission from removing him for such conduct if they deemed it detrimental to the public service.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 589–598; Dec. Dig. § 218.*]

2. MUNICIPAL CORPORATIONS (§ 218*)—CIVIL SERVICE—DISCHARGE—SUBSTANTIAL CHARGE.

The charge of a city's civil service commission that the clerk in charge of its computing room had from an examination of the rating sheets in the hands of monitors taken memoranda of the ratings of certain candidates, and left the room and premises with the same in his pocket, giving rise to suspicion by those working over and under him that he was giving out advance information, is a substantial one authorizing their removing him; he having no duty requiring him to take such memoranda at such time, and it not being required to accept his explanation that he was taking the same to see if they corresponded with ratings of such candidates which he had heard it rumored had been given out by some one in advance.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 589–598; Dec. Dig. § 218.*]

Clarke and Scott, JJ., dissenting.

Appeal from Special Term, New York County.

Mandamus by Albert D. McGuire against the Municipal Civil Service Commission of the City of New York, and those composing the same. From an order granting a peremptory writ requiring petitioner's reinstatement to the position of clerk in the office of the Commission, from which he was removed by order of the Commission, respondents appeal. Reversed, and motion denied.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Elliot S. Benedict, of New York City (Terence Farley, of New York City, on the brief), for appellants.

John Patrick Walsh, of New York City, for respondent.

LAUGHLIN, J. The petitioner shows that in the month of April, 1900, he duly passed an open competitive examination held by the Municipal Civil Service Commission of the City of New York for the position of senior clerk with said Commission and was duly appointed to that position on the 1st day of May, 1901; and that he served in that capacity until the 6th day of November, 1912, when he was dismissed after certain charges had been made and served upon him and he had been afforded an opportunity to explain them.

Petitioner further shows that he first served about a month as a clerk in the computing room, where computations of the ratings of those who enter civil service examinations are made after the papers have been marked by the examiners; that he thereafter served as a clerk in the Labor Bureau of the Commission until September, 1909, and thereafter as a clerk in the Information Bureau until October 9, 1911, when he was put in charge of the computing room and remained in charge of that room until his dismissal; that there were several employés of the Commission performing services in the computing room over whom and whose work he had supervision and charge; that his duties were to receive from the examiners for the Commission all examination papers on which they had passed judgment and on which they had marked the ratings they had given to the candidates, and the sealed envelopes containing the identification cards of the candidates,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and to open the sealed envelopes which contained information identifying the candidates who had been known to the examiners only by numbers, and to enter upon a schedule the name of the candidates and the ratings given to them by the examiners as computed by the other employés, and the percentage of the total possible marks which each candidate had obtained, and to prepare eligible list cards showing the standing which each candidate had received as a result of the examinations, and to arrange the same in the order of their standing beginning with the highest percentage obtained by any candidate, and "to lay out for the other employés of the Commission employed in the computing room the work to be done by them, and to be responsible to the Commission for the proper performance by each employé of the work assigned," and to guard the cards in the computing room against alteration or destruction and to prevent any information contained in the records from being given out without instructions from the Commission, and "if he should learn or suspect that information had leaked out from the computing room to investigate and endeavor to fix the blame for it"; that he had been instructed by the president of the Commission to carefully guard the cards and to be watchful of the employés under him, and "that he would be held responsible for any leak of information if such should occur"; that he and the employés under him prepared schedule sheets and eligible list cards, and that consequently such employés were in the possession of information showing the percentages which some candidates received and their position on the eligible list before the time when the list was ready for promulgation; that from October 19 to October 29, 1912, there was an exceptionally large amount of work of this character to be done in the computing room on the reports of the examiners with respect to 2,538 candidates for promotion as assistant foreman in the fire department, and that five women known as monitors were temporarily added to the force; that during this time he was informed that certain candidates who had taken the examinations for such promotion "claimed to know the percentage which they had received on the examination," and, with a view to ascertaining the source from which the information had been given out, he took notations from some of the monitors in order to determine whether the percentages of the candidates claiming to have information corresponded with the percentages which they claimed to have received; that the making of these notations was the basis of the charge made against him; that he found that the figures did not correspond and "dismissed the matter from his mind"; that rumors concerning the standing of some of the candidates were common with respect to examinations for promotion in the fire and police departments before the list was promulgated by the Commission, and that such rumors were usually baseless; that in making the notations he followed a practice which had long existed and which was not in violation of any rule, regulation, or order made by the Commission; that on the 6th of November, 1912, charges in writing were preferred against him by the Chief Examiner for the Commission as follows:

"I hereby prefer charges against Albert D. McGuire of conduct unbecoming an employé of this Commission and subversive of discipline and efficiency.

"From the 19th day of October to the 29th, inclusive, the papers in the

examination for promotion to assistant foreman, fire department, were in the custody of the clerk in the computing room, and during that time certain monitors were employed in calculating the percentages and preparing the schedule sheets. I charge that at different times during this period Mr. McGuire improperly interfered with the work of the monitors so engaged, endeavoring to obtain information with reference to some particular candidates; that he went to several of these monitors with a slip of paper in his hand seeking and getting information from the schedule sheets with reference to the standing of some of the candidates in that examination, and that he made memoranda on this slip of paper as a result of the information so derived and that his acts were irregular and improper."

That he appeared before the Commission, pursuant to notice from the chairman accompanied by a copy of the charges and affording him, at a time and place specified, an opportunity to make an explanation, and explained in substance his duties and the rumors which came to him and his investigation thereof as already stated, and gave to the Commission the names of persons who had informed him concerning rumors with respect to the standings of certain candidates, and would have given the names of the candidates but for the fact that he had been instructed by the president of the Commission that advance ratings were only to be given to him, and that the president of the Commission in questioning the petitioner "abruptly turned to other matters at the point when the question naturally led up to a disclosing of these names," and that he feared to give the information at that time lest it would be a disobedience of the order of the chairman of the Commission; that after making his explanation he was notified in writing by the president of the Commission that the Commission found his explanation to be unsatisfactory and had ordered that he be dismissed forthwith.

It was further shown in support of the petition, by the affidavit of one Conway, who had been assistant chief examiner, that with respect to nearly every examination for promotion in the police and fire departments rumors reached the office of the Commission to the effect that certain candidates had received certain ratings as a result of alleged unlawful conduct on the part of some unnamed employé of the Commission; that these rumors were generally unfounded, but that on one occasion an examination for police captain was set aside as a result of investigations in behalf of the Commission with respect to such rumors; that like rumors were afloat with respect to the examination in question for promotion in the fire department, and that during the compiling of the ratings of said examination they were brought to the attention of the president of the Commission with the result that certain firemen were dismissed from the service and others were fined; that it had been the practice during the tenure of office of various commissioners for employés of the Commission in the position which relator held at the time of his removal "to make some investigation of such rumors for the purpose of verifying them before presenting them to the Commission; that no rule or regulation or order prohibiting such investigation had ever been issued to his knowledge by any Commission against the practice."

In behalf of the Commission, it was shown in opposition to the motion that, before the ratings of the candidates at such examination

were published, several of the candidates came to the office of the Commission and asked for their ratings, stating that ratings had been given to other candidates; that about this time the chief examiner informed the commissioners that some of the monitors employed in the computing room had reported that the petitioner had obtained ratings from schedule sheets on which they were working and on which the ratings and standings of candidates were entered and had been making notes of such information; that thereupon charges were preferred against the petitioner, and at the meeting of the Commission at which he was afforded an opportunity to make an explanation the proceedings were taken down in shorthand, and several of the monitors of the Commission who had worked in the computing room at the time the petitioner obtained the information from the schedule sheets on which they were working testified to such occurrences, and one of them testified that the petitioner placed in his pocket the paper on which he made such notations and left the room immediately thereafter; that rumors with respect to certain candidates having obtained ratings in advance were *much more definite and persistent than usual* at the time in question, and an investigation in respect thereto led to the dismissal of several firemen from the fire department and to the imposition of fines on a number of others "for paying money to an employé of the Bureau of Highways of the Borough of Brooklyn for the purpose of securing a high rating upon the Civil Service eligible list for said position and for failure to report that they had been approached for such purpose by an alleged agent of said employé in said Bureau of Highways"; and that the "Commission felt that the requirement of the Civil Service Law, that appointments and promotions should be based upon competitive examination wherever practicable, would be rendered valueless if any of its employés, such as the petitioner, was in a position to communicate the results of one of its examinations to certain participants therein in advance of the publication of the eligible list made up as the result of such examination."

When the petitioner came before the Commission to offer an explanation, he attempted to explain his failure to inform the commissioners with respect to the rumors which came to him concerning the ratings of some of the candidates who took the examination, on the ground that in so far as his investigation went he found that the true ratings did not correspond with the rumors concerning them. He admitted that one of the monitors in the computing room remonstrated with him for looking at the rating sheets, and that he made answer that she was probably putting a wrong construction on what he was doing, and that he had looked at rating sheets in the hands of monitors at least half a dozen times, and that he took a sheet of paper and wrote down the ratings. On being asked by one of the commissioners why he wrote them down, his only answer was, "I did not see why I should not write it down," and, when pressed further for his object, he said that it was so that he might look it over afterwards and "discover how he got the impression that he got his rating"; and, asked if his purpose was not to go out and say that the rumor was right or wrong, he answered "I did not tell anybody outside. No one was interested to

that extent"; and he did not see that there was any. harm in his making a notation and thought that as chief of the bureau he had the right "to look over, the list under my jurisdiction," and when asked at this point by the president, "And copy down the ratings of particular candidates?" he answered, "Yes, I would naturally take it down when I looked at it." He was then asked, "What for, if it was only for your own benefit?" and he answered, "I said that." He was then asked, "Why did you write it down?" and he answered: "For the reason that I could sit down afterwards and compare notes and glean some information. If I had John Smith 69 and John Jones 68 and went to look them up and found they had 65 and 64, or something—then I think it would be right to sit down and look them over and when I had drawn my conclusions—" He was then asked where he got authority to take up matters of that kind and copy from the list the names for the purpose of verifying rumors, and he answered that he did not think it was necessary for him to report anything to the Commission until he had some tangible evidence that something was wrong. He was then asked where he obtained authority to discuss the list with any one outside or to copy the names or ratings or numbers of candidates from the official sheets when the records were required to be kept on the sheets and not in his pockets, and he answered, "That is all right. They were not written after leaving—" And he was again asked where he got authority to do that, and he said, "I didn't think there was any authority necessary for that matter. If I was going out to disclose it, it would be another matter entirely." He was then asked by one of the commissioners, "You didn't think that the custody of those papers included authority to copy from them, did you?" and to this question he made no answer. He then said that he made the notes from the records for the purpose of retaining them temporarily. And at this point the president of the Commission informed him that several witnesses had testified that he had left the bureau with them in his possession; but this he denied and asserted that he tore them up before leaving, and at this point one of the commissioners observed that he had stated that his purpose was to compare them with the rumors when he got time, and therefore the petitioner said, "I would look further." He was then apparently interrupted by the chairman, who said: "The testimony is that you left the room several times." The petitioner was then 'asked if he had any further explanation, and the petitioner replied that he had not.

[1] The fact that the Commission had not made a rule or issued an order forbidding the petitioner from examining the rating sheets in the hands of the monitors for the purpose of taking memoranda thereof with respect to the names and ratings ,of candidates and leaving the room and premises with such memoranda in his pockets did not preclude ,the Commission from removing him for such conduct if they deemed it to be detrimental to the public service. People ex rel. Hart v. Board of Fire Commissioners, 82 N. Y. 358.

[2] The authority ,of the commissioners to make appointments is found in section 123 of the Greater New York Charter (Laws 1901, c. 466), which provides, among other things, that they have authority to

appoint "a secretary, examiners and such other subordinates as may be necessary." It is contended in behalf of the appellants that section 1543 of the Greater New York Charter, which gives regular clerks, heads of bureaus, and persons holding positions in the classified Civil Service subject to competitive examination a right to make an explanation with respect to the grounds assigned for their removal, is not applicable to the appointees of the Civil Service Commission. It is claimed by virtue of section 3 of article 10 of the state Constitution and on the authority of Abrams v. Horton, 18 App. Div. 208, 45 N. Y. Supp. 887, and People ex rel. Fonda v. Morton, 148 N. Y. 156, 42 N. E. 538, that the appointees of the appellants hold during the pleasure of the Commission, and People ex rel. O'Keefe v. Hynes, 101 App. Div. 453, 91 N. Y. Supp. 1032, is relied upon to show that, if the petitioner was not entitled to an opportunity to make an explanation, the fact that they afforded him such an opportunity gives him no rights. I am of opinion, however, that it is not necessary to decide those questions on this appeal, for, assuming that the provisions of section 1543 are applicable, I think the petitioner was properly removed.

The theory upon which the writ was granted and upon which it is sought to sustain the order is that the charges were frivolous, and Matter of Griffin v. Thompson, 202 N. Y. 104, 95 N. E. 7, which reversed the decision made by this department by a divided court (140 App. Div. 904, 125 N. Y. Supp. 1123) is cited in support of that contention. In that case and in numerous other decisions (see People ex rel. Baum v. Butler, 120 App. Div. 807, 105 N. Y. Supp. 606; People ex rel. Brown v. O'Brien, 137 App. Div. 311, 122 N. Y. Supp. 25; People ex rel. Meeks v. Drummond, 141 N. Y. Supp. 315, April, 1913), it was declared to be the law with respect to the removals of persons in the civil service not entitled to a trial but merely to notice of charges and an opportunity to make an explanation that the official or body in whom the power of removal is vested, may act upon his or their own knowledge, or on any information received from other sources, and if the charge be substantial, the court is without authority to review the determination with respect to the sufficiency of the explanation; but that, if the charge be frivolous and without substance, then the removal may not be predicated thereon.

In the case at bar it is manifest that, if the charge was sufficient to give the commissioners jurisdiction to remove the petitioner, the exercise of that discretion should not be reviewed. No argument need be advanced to show the importance to the public interests of leaving a wide discretion to the commissioners in a matter of this kind, for not only would the civil service be demoralized, but the integrity of the commissioners would be questioned unless they are permitted to so conduct their offices and govern and control those in their employ that the civil service laws, rules, and regulations will be honestly and impartially administered, and in a manner to inspire and retain public confidence with respect thereto which would soon be destroyed by the giving out of advance information with respect to ratings or by a prevalent belief that this was done.

The petitioner was neither charged with making false ratings nor giving out advance information; but he had reason to believe that

such information was being given out, and he so conducted himself as to give rise to suspicion on the part of those working over and under him and on the part of the commissioners that he was giving it out. He had no duty to perform which required him to take memoranda in writing with respect to names and ratings of candidates at the time when he took them from the papers in the hands of the monitors. His conduct cannot be justified on the theory that it was his duty to see that those over whom he had supervision performed their duties. He was not, in these matters, examining the work of the monitors and other employés with that end in view. His only explanation for taking the memoranda is that they were taken with a view to comparing them with information he had received with respect to rumors afloat concerning the rating of some of the candidates; but it would seem that he did not show that he had in his possession any *memoranda with respect to such rumored ratings,* and if he had, or if he remembered the ratings according to the rumors, he could have discovered whether they corresponded on a mere inspection of the schedule of ratings in the hands of the other employés without writing down and carrying away in his pockets the actual ratings. Moreover, occupying such a responsible position, it would seem that, if he had had the proper conception of the duties of his office and of his duty to the commissioners, he would have reported to them and have asked them for instructions, instead of taking these memoranda in an apparently irregular manner, and putting them in his pockets and leaving the room or bureau, and thus giving rise to comment and suspicion on the part of the other employés. The commissioners were not obliged to accept his assertion with respect to what he deemed to be his duty, and it is evident from the questions that they propounded to him that they deemed his conduct most irregular and considered that it was no part of his duty to obtain this information in the manner and at the times charged.

I am of opinion, therefore, that the charges were substantial, and, since they were acted upon in good faith, there is no basis upon which the dismissal of the petitioner can be adjudged to have been illegal.

It follows that the order should be reversed, with $10 costs and disbursements, and motion denied, with $10 costs.

INGRAHAM, P. J., and McLAUGHLIN, J., concur. CLARKE and SCOTT, JJ., dissent.